ALBERT P. LAWSON, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 31525.)

Court of Claims, March 24, 1955.

*Joseph B. Murphy* and *Perry B. Rauch* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Harold S. Coyne* of counsel), for defendant.

MAJOR, J. This is a claim for personal injuries sustained by the claimant on July 27, 1952, when he dove into the water within the swimming area at Selkirk State Park, which is located on the east shore of Lake Ontario. This park is owned and operated by the State of New York and is open to the general public as a resort.

The swimming area is designated by buoy lines extending northerly about seventy-five feet from a concrete pier. This pier was built by the State for public use in connection with the park, and was about three feet above the water level, fifteen feet wide, and extended westerly 200 feet into said lake. There was one combination diving platform and lifeguard station constructed and maintained near the end of the pier. Patrons used the easterly portion of the structure to dive from, with an adjacent seat for the lifeguard on its westerly side. There were two additional lifeguard stations on this pier — one located about one hundred feet from shore and the other near the shore. The diving platform located out in the lake near the end of the pier, was raised about six feet above the pier level and about eight and one-half feet above the surface of the water. There was a visible painted sign stating "Depth 6 feet" on the side of this structure. This sign was a sufficient warning and indication that the depth of the water was six feet in this diving area. It was from this platform that the claimant dove at the time of the accident.

On the day in question, the claimant with a party of friends arrived at the park in an automobile at about noon. After the owner of the automobile (Douglas Allen) purchased a parking ticket, the car was parked and the party went to the picnic area, and then prepared for a swim before lunch. The swimming before lunch was done close to the shore. After lunch, swimming was resumed about 3:30 P.M. It was Sunday afternoon, the sun was shining and generally the weather was ideal for recreation and swimming.

There is a great difference in the testimony of the witnesses for the claimant and the witnesses for the State as to the facts leading up to and after the accident. From the credible evidence presented, the court finds that shortly after 3:30 P.M., the claimant walked to the diving structure near the end of the pier and climbed up the ladder to the diving platform. He talked with the lifeguard who was seated next to the platform and asked him if it was all right for him to dive off the platform. The lifeguard answered: "Yes". As the claimant stood ready to dive about eight and one-half feet above the water level, he could not see the bottom because of waves and ripples. He dove into the lake making a shallow swan dive, landing in the water fifteen to twenty feet from the pier. He struck a sand bar which spread his hands apart and caused his head to strike the bar with such impact that the claimant became groggy, could not see and after rolling over in the water, he stood up. There was no sign or other warning of the presence of this bar and the lifeguard made no mention of it. At this point the level of the water was up to claimant's waist, or about three and one-half to four feet deep. He walked to the pier and climbed up out of the water without assistance. After getting back on the pier, claimant's sight was blurred, his nose was bleeding slightly, and it was discovered that a narrow strip of hair was scraped off the top of his head and this area was bleeding, with sand embedded in the wound. On the day of the accident, claimant was twenty-one years of age, six feet tall and weighed 215 pounds. He described himself as an excellent swimmer. This was his first dive from this platform.

The claimant's contention that the depth of the water where he dove was only three and one-half to four feet was corroborated by other witnesses and the court finds such to be the fact.

A park is a pleasure ground set apart for recreation of the public to promote its health and enjoyment. (*Williams* v. *Gallatin*, 229 N. Y. 248.) The swimming area was part of Selkirk State Park. Swimming was provided, promoted and supervised by the State. Claimant was an invitee. The State owed the duty of reasonable care to its patrons. This duty involved the duty of diligence to ascertain whether water in the diving area was of sufficient depth to make it reasonably safe for the purpose, and to warn patrons by signs or otherwise of any hazard, latent or hidden danger, such as a sand bar or other underwater obstruction likely to cause injury. The State knew, or in the proper maintenance should have known the depth of the water and the presence of the sand bar within the roped-off

area, and is chargeable with at least constructive notice thereof. No warning was given or signs posted, correctly telling the depth of the water or the conditions underneath. On the contrary, a misleading, incorrect and deceiving sign posted in the diving platform of " 6 feet " readily and reasonably conveyed the conclusion that at the point of the accident, the water was six feet deep while actually it was only three and one-half to four feet deep. No personal warning was given to claimant as he prepared to dive from the side of the lifeguard sitting on the same platform.

Claimant suffered terrific headaches, pains through shoulders and back, and visited a physician who examined him and applied a dressing to his head, and he was taken to his home by his fiancee, now his wife. When his mother arrived home, he was taken to another physician, Dr. Collins, who ordered X rays and sent claimant to Dr. Kalamarides. Two days later, X rays were taken by Dr. Hale. Later, he returned to the University Hospital, Syracuse, where he was placed in bed with a traction unit — a harness around his chin and head with straps affixed to weights pulling his head away from the body, for little over a week. He returned to his home wearing a felt collar. The pain and suffering continued, and Dr. Kalamarides was interviewed again, whereupon claimant was fitted with a metal collar which he wore continuously for six or seven months, night and day. Sedatives were given to relieve the pain. This collar held claimant's head rigid and was worn continuously until February, 1953, when it was gradually discarded from time to time. In April, 1953, claimant developed a numbness in his left hand, caused by the ulnar nerve which is located in the region of the fracture. Claimant, in addition to headaches, sustained cuts and bruises, muscle spasms, dizzy spells, blurred vision and black-outs, a fracture of the seventh cerebral vertebra located at the base of the neck and one and one-half inches above the collarbone, injury to soft tissues in the lower portion of the neck and a concussion. The backward and forward motion of the neck is normal, but there is a permanent loss of 50% of its rotating motion to right and left, and 25% loss of bending motion to right and left.

Claimant's expenses were $112.70 hospital bill; $135 to Dr. Kalamarides; $60 for X rays; $390 loss of wages.

The State was negligent in the maintenance and operation of this diving area, and such negligence was the proximate cause of claimant's injuries and damages.

The claimant was not guilty of contributory negligence.

Claimant is entitled to an award for pain and suffering, and temporary and permanent injuries in the sum of $12,000; together with proven expenses and disbursements of $135 doctor bills; $112.70 hospital bill; $60 for X rays, and $390 loss of wages, or a total of $12,697.70.

The foregoing constitutes the written and signed decision of this court upon which judgment may be entered. (Civ. Prac. Act, § 440.)

Let judgment be entered accordingly.